# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| JOSHUA J. OSBORNE, | |
| Plaintiff, | Case No. 17-CV-754-JPS |
| v. | |
| WARDEN MICHAEL MEISNER, SANDRA HAUTAMAKI, ANDREW WESNER, CHAD KELLER, MATTHEW FOCHS, JASON RALLS, DEANNA TIMM, COREY HEFT, KIMBERLY JOHNSON, TRAVIS RODER, and BRIAN SMITH, | **ORDER** |
| Defendants. | |

Plaintiff Joshua Osborne ("Osborne"), a prisoner, brings this action pursuant to 42 U.S.C. § 1983 against Defendants, various employees at Redgranite Correctional Institution ("Redgranite"), alleging that they housed him in filthy, pest-ridden conditions which led to him suffer bug bites and a severe rash. (Docket #22 at 2–4). In particular, Osborne alleges that he was housed in a segregation cell that had "feces strewn on the floor and walls," was "forced to sleep on a mattress on the floor, next to a shower and shower drain that had insects coming out of the drain," and "in a single occupancy cell with another inmate." *See* (Docket #72 at 1). He claims that the bugs coming from the shower drain bit him repeatedly, causing him to "develo[p] a severe rash on various parts of his body that progressed quickly into a burning[,] painful suffrage of broken pus sacs." *Id.* He also says that he had to endure his mattress being soaked by the shower and the urinating of his cellmate. *See id.* at 9. He alleges that prison officials ignored

his complaints about his cell conditions and his requests for medical care. *See id.*

Osborne was allowed to proceed on three claims: (1) inadequate conditions of confinement, in violation of the Eighth Amendment; (2) medical malpractice under Wisconsin state law; and (3) deliberate indifference to his serious medical needs, in violation of the Eighth Amendment. *Id.* at 5–6. Defendants filed a motion for partial summary judgment as to the second and third claims, arguing that Plaintiff failed to exhaust his prison administrative remedies as to those claims before filing suit. (Docket #32). That motion was granted in an order dated December 27, 2017. (Docket #45).

The Defendants have now filed a motion for summary judgment as to the remaining claim: that the detestable conditions of Osborne's cell in segregation violated his rights under the Eighth Amendment. (Docket #56). The motion has been fully briefed and, for the reasons stated below, it will be granted.

1. **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56 provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d

356, 360 (7th Cir. 2016). The court must not weigh the evidence presented or determine credibility of witnesses; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010).

2. **RELEVANT FACTS**

   2.1 **Osborne's Failure to Dispute the Material Facts**

The relevant facts are undisputed because Osborne did not properly dispute them. In the Court's scheduling order, entered July 21, 2017, Osborne was warned about the requirements for opposing a motion for summary judgment. (Docket #14 at 3). Accompanying that order were copies of Federal Rule of Civil Procedure 56 and Civil Local Rule 56, both of which describe in detail the form and contents of a proper summary judgment submission. Most relevant here is Civil Local Rule 56(b)(2), which obligates the non-movant on summary judgment to file "a concise response to the moving party's statement of facts that must contain a reproduction of each numbered paragraph in the moving party's statement of facts followed by a response to each paragraph, including, in the case of any disagreement, specific references to the affidavits, declarations, parts of the record, and other supporting materials relied upon[.]" Civ. L. R. 56(b)(2)(B)(i).

Next, on February 5, 2018, Defendants filed the instant motion for summary judgment. (Docket #56). In the motion, Defendants also warned Osborne about the requirements for his response as set forth in Federal and Local Rules 56. *Id.* at 1–2. He was provided with additional copies of those Rules along with Defendants' motion. *See id.* at 3–11. In connection with their motion, Defendants filed a supporting statement of material facts and

accompanying evidence that complied with the applicable procedural rules. (Docket #58–#70).

In response, Osborne submitted a combined legal brief and a response to Defendants' statement of facts, but this document in no way suffices under the procedural rules to raise genuine disputes of fact. *See* (Docket #72). The document contains numerous assertions of fact by Osborne, but he neither cites nor attaches any evidence to corroborate any of these assertions—not even, for instance, his own sworn statements in a declaration. Instead, the Court has before it only Osborne's bald assertions that the facts are as he believes them to be. This is not what the rules require.

Despite being twice warned of the strictures of summary judgment procedure, Osborne utterly failed to dispute Defendants' proffered facts. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). Though the Court is required to liberally construe a *pro se* plaintiff's filings, it cannot act as his lawyer, and it cannot delve through the record to find favorable evidence for him. *See Waldridge v. Am. Hoescht Corp.*, 24 F.3d 918, 922 (7th Cir. 1994); *Herman v. City of Chicago*, 870 F.2d 400, 404 (7th Cir. 1989) ("A district court need not scour the record to make the case of a party who does nothing."). Thus, the Court will deem Defendants' facts undisputed for purposes of deciding their motion for summary judgment. *See* Fed. R. Civ. P. 56(e); Civ. L. R. 56(b)(4); *Hill v. Thalacker*, 210 F. App'x 513, 515 (7th Cir. 2006) (noting that district courts have discretion to enforce procedural rules against *pro se* litigants).[1]

---

[1]The absence of any evidence from Osborne's present submission is all the more noticeable inasmuch as he did submit an affidavit and other documentary evidence in opposition to Defendants' first motion for partial summary judgment. *See* (Docket #38, #39, #40). Why he chose not to make a complete and effective evidentiary submission here, the Court cannot say.

## 2.2 Facts Material to Defendants' Motion

Osborne was housed in Redgranite's restrictive housing unit ("RHU") from September 7, 2016 through October 3, 2016. Osborne was initially placed in the "D-wing" of the RHU, but was moved to cell C-6 on September 22, 2016. He remained in cell C-6 until October 3, 2016.

Upon his placement into cell C-6, Osborne complained that he should not have a cell mate and that he should not be required to sleep on a dirty floor. Osborne alleges that when he arrived at cell C-6 and complained about sleeping on the dirty floor, Jason Ralls ("Ralls"), a correctional officer, threatened to tase him and issue him a conduct report if he did not voluntarily go into the cell.

However, Ralls did not place Osborne in cell C-6 on September 22, 2016. Ralls typically worked in the RHU's "bubble," where he controlled the entrance/exit doors to the unit and cells. Further, RHU officers do not have the ability to use tasers in the unit. According to Ralls, Osborne never reported complaints about cell C-6 to him at any time, nor did Ralls ever observe abnormal conditions in the unit or smell human waste. If he had been made aware of Osborne's alleged serious bug bites and rash, Ralls would have checked on Osborne's condition and the condition of the cell. If Ralls had observed the type of rash and symptoms that Osborne

---

In one passing mention in his brief, Osborne says that he "must rely on all the other evidence submitted to this point," (Docket #72 at 2), apparently referring to various affidavits and sets of documents he has filed throughout this case, sometimes in connection with a pending motion and sometimes not, *see, e.g.*, (Docket #16, #18, #19, #25, #27, #39). However, he did not once cite any of these documents in his response to Defendants' statement of facts, leaving to the Court the task of combing the record for the evidentiary support for his attempted disputes. The Court's time and resources are too thinly stretched to do that sort of heavy lifting on behalf of any party, *pro se* or otherwise. Moreover, the Court cannot transform its duty of generous construction into an advocate's role.

described in his complaint in this case, Ralls would have notified the prison Health Services Unit ("HSU").

Not all RHU cells are single cells. Osborne was not placed in a single cell because he did not have a medical need for a single cell and the prison's policy was to double cell inmates if there was not enough room for them to be single celled. True, cell C-6 had only one actual bed—a concrete slab about eighteen inches off the ground—but it was able to house two inmates by placing another mattress on the concrete floor. Both mattresses are approximately four inches thick. The dimensions of the cell are such that a mattress does not need to be placed in close proximity to the cell's toilet and floor drain, which are at the back of the cell. Instead, the floor mattress can be placed against the back of the cell door. *See* (Docket #70-1).[2]

---

[2]Osborne alleges that he should have been single-celled due to his medical conditions, including mild cerebral palsy causing hyperflexia and bulging discs in his back. (Docket #74 ¶ 6). Further, in Osborne's view the four-inch-thick mattresses provided by the prison are low-quality and quickly flatten to one or two inches, providing little support or comfort. *Id.* ¶ 8. Because of these problems, Osborne believes he needed a mattress on the concrete slab bed, not on the floor. *See id.* ¶ 6. He cites no evidence for his medical conditions or his bed restriction. The claimed restriction seems entirely his own conjecture, unsupported by any medical opinion. *See Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir. 1989) ("A party to a lawsuit cannot ward off summary judgment with an affidavit or deposition based on rumor or conjecture" but must instead rest on the witness' personal knowledge).

Likewise, Osborne argues that he was sent to the RHU for disciplinary separation, and he believes—without citation to evidence—that this means he was to be single-celled. (Docket #74 ¶¶ 6, 7). Osborne also contends that the floor mattress had to be placed nearer the cell's floor drain and toilet out of practicality: "In reality, the mattresses are away from the door to accommodate people, medication, food, and such coming through the door/trap. The mattress ends up several feet away from the door, rather than constantly moving the mattress." *Id.* ¶ 9. Such freewheeling speculation based on what Osborne believes "segregation" to be, or why his mattress had to remain permanently near the cell drain and toilet, even during sleeping time, is not enough to contest Defendants' proffered facts. *Amadio v. Ford Motor Co.*, 238 F.3d 919, 927 (7th Cir. 2001); ("It is well-settled that

Staff conduct cell searches monthly and inspect cells on a daily basis during rounds. If a cell is in bad condition, the rounding staff would contact a supervisor. Cells are also searched when inmates are in other parts of the prison, such as recreation or the law library. If there were serious issues noted with the conditions of a cell, staff would notify a supervisor and a work order would be completed. If a particular cell is determined to be uninhabitable, inmates are housed in different cells until the problem is fixed.

Inmates are provided ample access to staff and can make verbal complaints about cell conditions if necessary. For example, inmates have access to staff when they conduct rounds and when they deliver mail, medication, and meal trays. Inmates may also have access to staff when they are permitted to move about the institution, such as going to recreation or to make phone calls. There is an emergency button in each cell in the RHU that inmates can use to contact staff for medical emergencies.

Inmates have the ability to clean their cells three days per week at Redgranite: every Sunday, Wednesday, and Friday. Inmates are offered a broom, dust pan, wash rags, a fresh garbage can, and toilet cleaner. Osborne was in cell C-6 for one and a half weeks. During that time, he would have been given fresh sheets on at least one occasion. Also during that time, he would have been given cleaning supplies for his cell on at least four occasions.

Osborne wrote to Deputy Warden Sandra Hautamaki ("Hautamaki") on September 26, 2016. He informed Hautamaki that he was "sleeping on a shower drain next to a toilet. . . . I got what looks like bug

---

speculation may not be used to manufacture a genuine issue of fact."); *Palucki*, 879 F.2d at 1572.

bites on my body." (Docket #68-1 at 1). Osborne does not mention precisely who he contacted regarding his concerns, but states that he spoke to correctional officers and "all" sergeants and was denied a move to a different cell where he could sleep on a concrete slab rather than the floor. *Id.* Osborne does not describe the alleged bug bites in this correspondence and does not mention his bedding getting soaked with urine.

Hautamaki responded on September 27, 2016 and referred Osborne to speak with officials in the appropriate chain of command, including Captain Chad Keller ("Keller"). Osborne claims in his amended complaint that he received no response to his inquiries within the chain of command, *see* (Docket #21 at 3), though he does not specifically allege to whom his inquiry was directed.

Osborne filed an inmate grievance on September 26, 2016. He complained that "I am sleeping on the floor in seg," and "I have bug bites all over me." (Docket #67-1 at 11). Further, he protested that "The rooms in seg are set up for one person not two people. My mattress is on the floor on top of the shower drain and is right next to the toilet." *Id.* Osborne did not mention the serious medical ailments that he alleges in this lawsuit. In fact, under "action requested" on the grievance form, he did not even request to see prison medical staff. He simply asked to be moved to a single cell, or back into the general population. *Id.* at 12.

Osborne's grievance was dismissed on October 9, 2016, after Osborne had already been moved from cell C-6, which had occurred on October 3. This dismissal was reviewed and approved by Warden Michael Meisner ("Meisner") that same date. This was Meisner's first notice of the alleged unsanitary conditions of the cell, and it was nearly one week after Osborne was removed from the cell.

Osborne filed several Health Services request forms during this period. The first was dated September 24, 2016. In it, Osborne claims that he was sleeping "on top a shower drain less than 2 feet away from toilet." (Docket #69-1 at 6). He also described "mysterious" bumps that "itch a lot." *Id.* Osborne was tentatively scheduled for an appointment with staff in the HSU for September 27, 2016.

Osborne submitted another Health Services request on September 28, 2016. He complained that he had not yet been seen in the HSU for the "bumps/bites on [his] skin" and was still sleeping on the floor. *Id.* at 7. He stated, "Never would [have] had this problem if I was not forced to move to C-6." *Id.* A nurse responded that he would be scheduled to be seen in the HSU.

Osborne was seen by nursing staff in the RHU itself on September 23, 26, 28, and 30, 2016. He did not complain about bug bites or the condition of his cell during any of those encounters. On September 30, 2016, a nurse saw Osborne in the RHU and offered him an appointment in the HSU. The nurse says that he refused, and the nurse's report reflects that he stated his conditions were "healing" and "gone." *Id.* at 8. He did not sign the form, however, and he alleges that he did not refuse care on this date. The nurse that saw Osborne that day did not observe a rash or anything out of the ordinary. If she had seen bug bites or a rash, she would have referred him to be seen by an advanced care provider.

The first time that Osborne was seen in the HSU following his stint in cell C-6 was October 19, 2016. At that time, Osborne reported left leg pain, not a rash or bug bites. He was seen on October 30, 2016 for acne, muscle spasms, and foot pain. Again, Osborne did not complain about any of the symptoms that he alleges in this lawsuit.

Osborne named a host of correctional officers as defendants, but all say they had no knowledge of Osborne's cell conditions or medical ailments at the relevant time, whether learning it from him or through any other source. These include Captain Keller, Matthew Fochs ("Fochs"), Andrew Wesner ("Wesner"), Corey Heft ("Heft"), Deanna Timm ("Timm"), Travis Roder ("Roder"), Brian Smith ("Smith"), and Kimberly Johnson ("Johnson"). Many of these officers worked in the RHU on one or more days during the relevant time frame. All aver that Osborne did not report concerns about his cell or bug bites to them, and none observed bites, bumps, or rashes on Osborne during the relevant time, nor did any of them observe any substandard conditions in the RHU, such as filth or the smell of human waste. Each officer maintains that if he or she had observed such conditions in cell C-6, they would have ensured it was inspected and taken necessary remedial action. Similarly, if Osborne had reported a medical concern such as a rash, each officer would have directed him to seek care from the HSU personnel.[3]

### 3. ANALYSIS

The Supreme Court has interpreted the Eighth Amendment as requiring a minimum standard for the treatment of inmates by prison officials: prison conditions must not, among other things, involve "the wanton and unnecessary infliction of pain." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). An inmate's constitutional challenge to the conditions of his

---

[3] Osborne accuses the officers of lying about their work schedules and what they perceived or did not perceive within the RHU, but the credibility of witnesses is not an issue the Court can resolve during summary judgment. *See* (Docket #74 ¶¶ 64–79); *Berry*, 618 F.3d at 691.

confinement has two elements. *Whitman v. Nesic*, 368 F.3d 931, 934 (7th Cir. 2004).

First, he must show that the conditions at issue were "sufficiently serious" so that "a prison official's act or omission results in the denial of the minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotations omitted). Prison conditions may be "harsh and uncomfortable without violating the Eighth Amendment's prohibition against cruel and unusual punishment." *Dixon v. Godinez*, 114 F.3d 640, 642 (7th Cir. 1997). The Eighth Amendment "does not require prisons to provide prisoners with more salubrious air, healthier food, or cleaner water than are enjoyed by substantial numbers of free Americans." *Carroll v. DeTella*, 255 F.3d 470, 472–73 (7th Cir. 2001). Rather, "extreme deprivations are required to make out a conditions-of-confinement claim." *Turner v. Miller*, 301 F.3d 599, 603 (7th Cir. 2002); *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).

Second, even if conditions were sufficiently severe, the prisoner must also demonstrate that prison officials acted with "deliberate indifference" to the risk created by those conditions. *Wilson v. Seiter*, 501 U.S. 294, 302 (1991); *Whitman*, 368 F.3d at 934. "Deliberate indifference" means that the official knew that the inmate faced a substantial risk of serious harm from the conditions in question, and yet disregarded that risk by failing to take reasonable measures to address it. *Farmer*, 511 U.S. at 847; *Johnson v. Phelan*, 69 F.3d 144, 149 (7th Cir. 1995); *Grieveson v. Anderson*, 538 F.3d 763, 777 (7th Cir. 2008) (deliberate indifference arises when prison officials "ac[t] with the equivalent of criminal recklessness"). It is not enough for the inmate to show that the official acted negligently or that he or she should have known about the risk. *Pierson v. Hartley*, 391 F.3d 898,

902 (7th Cir. 2004); *Haley v. Gross*, 86 F.3d 630, 641 (7th Cir. 1996). Instead, the inmate must show that the official received information from which the inference could be drawn that a substantial risk existed, and that the official actually drew the inference. *Pierson*, 391 F.3d at 902. That is, "a plaintiff must establish that the official knew of the risk (or a high probability of the risk) and did nothing." *Pope v. Shafer*, 86 F.3d 90, 92 (7th Cir. 1996). In the end, it is "obduracy and wantonness, not inadvertence or error in good faith, that characterizes the conduct prohibited by [the] Eighth Amendment[.]" *Whitley v. Albers*, 475 U.S. 312, 319 (1986); *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998) ("[T]he Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold" of constitutional protections).

Osborne's claim fails on both elements. The Court will explore each element in turn below.

### 3.1 Objectively Serious Conditions

First, Osborne offers no evidence whatsoever that the conditions in his RHU cell were as bad as he alleged, not even a sworn statement to that effect. To survive summary judgment, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co, Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Seventh Circuit has repeatedly emphasized that summary judgment "is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005).

Osborne's unsupported speculation and conjecture about the state of cell C-6 is not enough to survive summary judgment. True, Defendants do not have records about the cleanliness of cell C-6 prior to Osborne's arrival, but neither has he any evidence that it was filthy and pest-ridden. Undoubtedly a feces-covered cell overrun by bugs and stench would raise constitutional concerns, but Osborne has done no more than allege this. Summary judgment is the time to move past the pleadings and offer real evidence raising a genuine dispute for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); Fed. R. Civ. P. 56(c)(1).

Moreover, the undisputed facts show that Osborne's allegations about the dreadful cell conditions are overblown. The cell is large enough that, during sleeping time, Osborne could move the floor mattress up against the door, several feet from the floor drain and toilet. This should have ameliorated many of his concerns, particularly with respect to wet sheets and his cellmate's urination. Osborne does not challenge this fact except to say that practicality demanded moving the mattress to the back of the cell. (Docket #72 at 3). But the Eighth Amendment does not come into play when a prisoner is forced to choose between clean sleeping conditions and expediency; he should have moved the mattress when required to ensure he did not sleep too near the drain or toilet. *Williams v. Ramos*, 101 F.3d 110, 1996 WL 625613, at *2 (7th Cir. 1996) (prisoner could not state Eighth Amendment claim for a cold cell when he chose to refuse state-issued blankets).

Additionally, other than unsubstantiated griping about lax cleaning protocols at the prison, *see* (Docket #72 at 3), Osborne does not dispute Defendants' contention that they provided him cleaning supplies at least four times during his week-and-a-half stay in the RHU, and clean sheets at

least once. The fact that he was regularly afforded cleaning supplies and fresh linens distinguishes Osborne's case from many others found to allege viable Eighth Amendment claims. *See, e.g.*, *Gray v. Hardy*, 826 F.3d 1000, 1006 (7th Cir. 2016); *Sanchez v. McCann*, No. 09 C 2289, 2010 WL 1408917, at *3 (N.D. Ill. Apr. 2, 2010); *Barbosa v. McCann*, No. 08 C 5012, 2009 WL 2913488, at *4 (N.D. Ill. Sept. 8, 2009). Besides, Osborne cannot refuse to participate in the maintenance of his own environs and then claim a constitutional violation arising from the filth. *Williams*, 1996 WL 625613, at *2.

Finally, it is unlikely that Osborne can maintain a claim under the Eighth Amendment even had the conditions been as bad as he alleges, for he was only subjected to these conditions for one and a half weeks. Some courts have found that "[p]rolonged pest infestation, specifically a significant infestation of cockroaches and mice, may be considered a deprivation sufficient to constitute a due process violation." *Sain v. Wood*, 512 F.3d 886, 894 (7th Cir. 2008). But the conditions described by Osborne, given their very short duration, fall short of a denial of the minimal civilized measure of life's necessities. *Farmer*, 511 U.S. at 834. A week and a half of such exposure pales in comparison to the "sixteen months of infestation and significant physical harm" that was found to state claim for inhuman conditions of confinement in *Antonelli v. Sheahan*, 81 F.3d 1422, 1431 (7th Cir. 1996). Applying *Antonelli*, the Seventh Circuit later found sufficient a prisoner's claim that "over five years the "bugs, roaches, spiders, wasps, [and] bees" [in his cell] had bitten and stung him so often as to leave multiple scars, wounds, and sores, causing him internal injuries." *White v. Monohan*, 326 F. App'x 385, 387 (7th Cir. 2009). But even then, the Court of Appeals pointed out that it was a "close case." *Id.* Similarly, assuming cell

C-6 was initially contaminated with foul-smelling waste, which courts view as especially deplorable among potential living conditions, *DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001), the fact that Osborne had many chances to complain about it or clean it up, and did neither, means his claim in this Court must fail, *see Johnson v. Pelker*, 891 F.2d 136, 139 (7th Cir. 1989) (housing inmate in cell without running water and smeared with human waste for three days, without providing cleaning supplies, stated an Eighth Amendment claim).

The existence of filth and bugs in a cell for this span of time, while unpleasant, is simply not enough to trigger constitutional protections. *See Chapman v. Knight*, Civil Action No. 1:09CV–00092–JHM, 2010 WL 3001708, at *5 (W.D. Ken. July 27, 2010) (no objectively serious condition where inmate suffered exposure to bed bugs for two weeks). This is especially true where, as here, the prisoner has not offered evidence to corroborate his claims of medical injury. *See Antonelli*, 81 F.3d at 1431 (sixteen-month bug infestation seriously impacted inmate's health); *White*, 326 F. App'x at 387 (extreme cell temperatures caused prisoner to vomit blood). Contrary to Osborne's assertion that the conditions of the cell constituted a constitutional violation from the moment he entered, (Docket #72 at 3), even severe conditions of confinement can be tolerated for a time without offending the Constitution, *Sain*, 512 F.3d at 894 (cockroach infestation, while "certainly unpleasant," was not sufficiently serious as to constitute a constitutional violation); *Harris v. Fleming*, 839 F.2d 1232, 1235 (7th Cir. 1988) ("Inmates cannot expect the amenities, conveniences and services of a good hotel[.]").

Osborne's other attacks on cell conditions beyond their state of cleanliness likewise fall short. First, on the prison practice of double-celling

inmates in the RHU, he claims that being put in "segregation" meant that he had to be in a single cell "per policy," (Docket #72 at 2), but a violation of a prison policy, or even state law, is not a violation of the Eighth Amendment, *see Guajardo-Palma v. Martinson*, 622 F.3d 801, 806 (7th Cir. 2010); *Whitman*, 368 F.3d at 935 n.1. Second, as to his assertion that his medical conditions required a placement other than on a mattress on the floor, (Docket #72 at 2), he offers no evidence showing he had such a restriction. His belief about how to best care for his medical conditions is no mandate for the prison. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997) (prisoners are "not entitled to demand specific care [nor] entitled to the best care possible"). In the end, while it is true that "[s]ome conditions. . .may establish an Eighth Amendment violation in combination when each alone would not do so," such as "'a low temperature at night combined with a failure to issue blankets,'" *Gillis v. Litscher*, 468 F.3d 488, 493 (7th Cir. 2006) (quoting *Wilson v. Seiter*, 501 U.S. 294, 304 (1991)), here all of the conditions pass constitutional muster, and none are severe enough, alone or in combination, to raise triable issues of fact on Osborne's Eighth Amendment claim.

### 3.2 Deliberate Indifference

Osborne has similarly failed to prove that Defendants acted with a sufficiently culpable state of mind. To proceed to trial, Osborne was required to provide some evidence permitting the inference that each Defendant subjectively had knowledge of his plight—assuming for a moment it was sufficiently severe—and disregarded the risk to his safety. *Whitman*, 368 F.3d at 934. He has not met that burden with respect to any of the Defendants.

First, Hautamaki appropriately responded to Osborne's inquiry about his cell conditions. She told him to seek relief through the chain of command, then heard nothing more of the matter. Whether Osborne feels that the risk was not ultimately averted is of no moment; Hautamaki responded reasonably to the risk as she was aware of it. *Chapman*, 2010 WL 3001708, at *5 (officials not liable where they responded reasonably at each step despite the failure to abate the bed bug problem). Notably, Osborne's more concerning allegations—urine-soaked sheets, rashes, and an infection—are totally absent from his letter to her. She did not have a freestanding obligation to proactively investigate Osborne's situation and put matters to rights. *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009).

Second, Meisner is not responsible for his employees' misconduct by virtue of his status as a supervisor. Instead, he could be liable only if he knowingly turned a blind eye to an ongoing problem. *See Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). But here, Meisner had no knowledge of Osborne's claims about cell C-6 until after he had been removed from it. Meisner had no ability to rectify a situation that had already been resolved.

Third, Osborne fails to raise triable issues of fact as to the mental state of the many prison guards he names as defendants. In what has become a theme for his submissions in this case, Osborne broadly asserts that he complained to everyone, all the time, about his cell conditions and injuries, but he offers no specifics—and no evidence—that could give rise to an inference that any one official displayed the requisite deliberate indifference. *See* (Docket #72 at 3) (Osborne arguing that he "attempt[ed] verbal complaints, numerous times. . .[and] use[d] the emergency button to notify staff. . .and any other form [of notification] he could"); *id.* at 4

("Osborne used every possible means to make staff aware of his medical issues, including the filthy conditions of the cell he was in."); (Docket #74 ¶¶ 64–69).

Osborne may be right that in his inmate grievances, and even in his complaint in this action, he was not required to name each prison official he spoke with. (Docket #72 at 5). But at the crucible of summary judgment, he was required to do so. At this stage, Osborne had to demonstrate that his evidence raised triable questions as to the liability of each particular defendant on his Eighth Amendment claim, and without some indication that the defendant had the requisite knowledge and disregarded it, he cannot meet that burden. *Hammel*, 407 F.3d at 859.

The undisputed facts are that all officers did not perceive any of the conditions Osborne alleges existed in cell C-6 during the pertinent time frame, whether from his complaints or their own observations. The same goes for his alleged medical ailments. Each officer maintains that had they gained such knowledge, they would have reported it to the appropriate official and ensured something was done to fix the problem. No evidence in the record contradicts this testimony.

Osborne's allusion to his healthcare requests does not fill the gap in his evidence. To the extent Osborne is attempting to re-litigate the issue of his exhaustion of prison administrative remedies, *id.* at 8, 13–15, which the Court has addressed twice before, *see* (Docket #45, #71), it is unavailing. Similarly, to the extent Osborne argues the merits of his medical deliberate indifference or medical malpractice claims, (Docket #72 at 6–7, 10–13), it is beside the point, as those claims were dismissed for failure to exhaust administrative remedies. The Court cannot sidestep the exhaustion requirement and proceed to the merits, as it has already explained to him.

And if Osborne believes that submitting Health Services requests put all prison officials on notice of his ailments and cell conditions, he is simply mistaken. When assessing a claimed constitutional violation, the Court cannot treat prison officials as a unitary body. Rather, each official is responsible for those things he or she did, or failed to do, based on the official's own personal knowledge. *Gentry*, 65 F.3d at 561; *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988). And while it is inferable that "prison guards working in the vicinity necessarily would have known about the condition of the segregation cells," *Vinning-El v. Long*, 482 F.3d 923, 925 (7th Cir. 2007), here Osborne has not proffered evidence to challenge any of the officers' statements that they observed none of the awful conditions about which he now complains.

Furthermore, even if one believed Osborne's allegations that some of the officers directed him to contact the HSU rather than doing so themselves, it takes him nowhere. Osborne alleges in his amended complaint that in encounters with Timm, Heft, Roder, and Smith, he complained about his injuries and was told him to contact the HSU or simply "deal with it." *See* (Docket #21 at 2). The security staff acted reasonably when they directed Osborne to complete Health Services requests. Osborne maintains that they were required by prison policy to contact HSU personnel in an emergency case like his. (Docket #72 at 4). But again, prison policy is not coextensive with constitutional constraints. And while Osborne is right that violation of prison policies can be circumstantial proof of prison officials' knowledge and state of mind, *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 930 (7th Cir. 2004), he has no evidence that prison policy was violated. Osborne has not coherently argued that his rash constituted a medical emergency within the meaning of prison policy.

It is simply his uncorroborated belief, nothing more. The undisputed facts in the record show that none of the named defendants observed a medical emergency or the deplorable conditions of which Osborne complained. Thus, it was reasonable for them to refer him to the usual process for submitting requests for medical care.

**4. CONCLUSION**

The undisputed facts demonstrate that Osborne was not housed in conditions so inadequate as to violate his constitutional rights under the Eighth Amendment, nor were any of the Defendants deliberately indifferent to any constitutionally infirm condition. As a result, his claim on that score, and with it the case a whole, must be dismissed.

Accordingly,

**IT IS ORDERED** that Defendants' motion for summary judgment (Docket #56) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiff's claim of inadequate conditions of confinement in violation of the Eighth Amendment (Docket #22 at 5–6) be and the same is hereby **DISMISSED with prejudice**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 25th day of April, 2018.

BY THE COURT:

_____
J. P. Stadtmueller
U.S. District Judge